**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

American Financial Resources, Inc.,

      *Plaintiff*

          v.

Nationstar Mortgage, LLC,

      *Defendant*

**Civil Act. No.:  2:14-cv-07555-CCC-MF**

---

**MEMORANDUM OF LAW IN SUPPORT OF
ORDER TO SHOW CAUSE
FOR A PRELIMINARY
INJUNCTION**

---

# Table of Contents

PRELIMINARY STATEMENT ................................................................................. 1
   A.   Background .................................................................................................. 3
PROCEDURAL HISTORY AND BACKGROUND FACTS ................................... 4
   A.   The Underlying Litigation............................................................................ 4
   B.   AFR's Good Faith Attempts to Work with Nationstar ................................. 7
   C.   Nationstar's Document Deficiencies Irreparably Injure Borrowers ............. 8
   D.   AFR's Inability to Access the HUD Web Portal Irreparably Injures AFR .... 10
   E.   Nationstar's Document Deficiencies Irreparably Injure AFR by Threatening its Existence ...................................................................................................... 12
   F.   Mandatory HUD Claim and Incentive Remittal ......................................... 13
LEGAL STANDARD............................................................................................. 14
   A.  AFR has a high likelihood of success on the merits..................................... 15
   B.  AFR Will Suffer Immediate and Irreparable Harm ....................................... 16
      1.   IRREPARABLE DAMAGE WILL RESULT WHEN LOANS ARE NO LONGER FHA OR HUD INSURABLE......................................................... 16
      2.   IMPROPERLY RECORDED NOTES AND MORTGAGES (OR NOT RECORDED AT ALL) PRESENT AN INACCURATE AND FALSE PUBLIC RECORD................... 17
      3.   IRREPARABLE DAMAGE WILL RESULT FROM THE DAMAGES CAUSED TO AFR'S SECURITY INTEREST. ................................................. 17
      4.   IRREPARABLE DAMAGE WILL RESULT FROM NO PARTY HAVING THE LEGAL AUTHORITY TO MAINTAIN AND PRESERVE THE PROPERTIES IN ISSUE .................................................................... 18
      5.   NATIONSTAR'S FAILURE TO CORRECT THE DOCUMENT DEFICIENCIES WILL CRIPPLE IF NOT KILL AFR. .................................................... 19
   C.  Balancing of the relative hardships.............................................................. 19
   D.  Granting an injunction is in the public interest ............................................. 20
CONCLUSION....................................................................................................... 21

# Table of Authorities

<u>Supreme Court</u>

*Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20, 24 (2008) ..................................14

<u>Federal Cases</u>

*Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1334 (Fed.Cir.2006) .............................. 14
*Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985) .............................................. 14
*American Express Travel Related Servs., Inc. v. Sidamon–Eristoff,* 669 F.3d 359, 366 (3d Cir.2012) ................................................................. 14
*Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233, 236 (D.N.J. 1976) ......... 16, 19
*Citibank, N.A. v. Singer Co .,* 684 F.Supp. 382, 385–86 (S.D.N.Y.1988) ................................... 18
*Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 206 (3d Cir.1990) ......................... 16
*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ..16
*Kos Pharm., Inc. v. Andrx Corp.* 369 F.3d 700, 708 (3d Cir.2004) ......................................... 14
*Punett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980) .................................................................. 14
*Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir.1984) .......................... 16
*Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995) ................................ 14

<u>State Cases</u>

*Crowe v. De Gioio*, 90 N.J. 126, 132-34 (1982) ....................................................................... 16
*E. N.Y. Sav. Bank v. 520 W. 50th St., Inc.,* 611 N.Y.S.2d 459, 462 (N.Y.Sup.Ct.1994) ............ 18

<u>Statutes and Regulations</u>

12 U.S.C. § 1701 *et seq* ......................................................................................................... 16, 20
24 CFR 203.371 ............................................................................................................... 13, 15-16

## PRELIMINARY STATEMENT

This matter is directed to the acts and omissions of Nationstar Mortgage, LLC ("Nationstar") as servicer of certain mortgage loans[1] owned by plaintiff American Financial Resources, Inc. ("AFR").   Simply stated, for well over a year, the loans in issue in this application have had "clouds on title" and other uncertainties associated with them, adversely impacting: (a) AFR; (b) the many many borrowers; and (c) the various collateralized mortgage pools in which many of those loans exist. This application is directed to removing these untenable and avoidable clouds on title and uncertainties.

While aspects of the instant action are straight forward breach of contract issues which the parties will resolve in the normal course, a more significant portion relates to missing mortgage documentation (original Promissory Notes, filed Mortgages and Modifications of the foregoing etc., hereinafter, "Loan Documents") which Nationstar was legally obligated to have provided to either AFR and/or its subsequent servicer LoanCare, or, as the case may be, the Housing and Urban Development Administration ("HUD") pursuant to HUD Regulations and FHA Guidelines (the "Nationstar Document Deficiencies").   The Loan Documents that comprise the Nationstar Document Deficiencies are inherently unique "signed" documents and the implications of their loss is untold.   Those documents were last "seen" in Nationstar's custody and control, and by virtue of both applicable law and contract, were required to be recorded,

---

[1]((a) collecting, accounting and undertaking appropriate action based on borrower mortgage and escrow payments, (b) undertaking appropriate and necessary action in the event of late or missed payments (including  but not limited to prompt notice to borrowers of payment status, available alternatives and implications, including modification programs and foreclosure), (c) undertaking appropriate and necessary action in the event of default (including but not limited to foreclosure), (d) appropriate and necessary maintenance and resale of foreclosed properties, (e) filing and prosecution of mortgage "insurance" claims in the event appropriate, and (f) otherwise adhering to acceptable mortgage servicing standards.)

maintained and/or transferred in the normal course.  Not only will failure to produce these documents cause immediate irreparable injury, but it will also turn what is now millions of dollars in currently ascertainable damage into in excess of fifty million dollars or more.  These grave consequences are to be weighed against the non-existent burden of requiring Nationstar to produce and/or replace the missing Loan Documents.  A failure to produce and/or replace these documents will lead to immeasurable and irreparable harm to: (a) AFR; (b) the wholly innocent third party borrowers; and (c) the owners of the collateralized mortgage pools to which some rights to some of these loans have been sold.  Whereas, the burden to Nationstar is simply doing what it has already been paid to do.

More specifically, Nationstar's failure to supply and/or record the aforementioned Loan Documents and correct the Nationstar Document Deficiencies will lead to, if not corrected, by way of example only:

(a) The loans in issue no longer being HUD and/or FHA insured; and/or

(b) Improperly recorded titles and liens and an inaccurate and false public record of the foregoing; and/or

(c) Inappropriate notices of default (or lack thereof where appropriate) and/or an inability to properly service foreclosure proceedings because of misdirected payments; and/or

(d) Inappropriate defaults and/or foreclosure proceedings because of misdirected payments; and/or

(e) Misdirected or misstated payoff requests; and/or

(f) The borrower's inability to transfer title because of the foregoing defects; and/or

(g) The foregoing properties not being maintained as a result of no party having the legal authority to maintain and preserve them for the benefit of all, including but not limited to the borrower and the owner of the mortgage; and

(h) AFR potentially being forced to re-purchase these loans out of loan pools and suffer the potentially devastating economic hardship and loss associated therewith.

If allowed to occur, the foregoing will have a significant, if not life threatening, impact on AFR's ability to continue.  If the documents are not produced, either in original form or re-executed by borrowers, a task only Nationstar can undertake, the foregoing, all of it, will happen.  In fact, it is happening now and must be stopped.

### A.   Background

Nationstar was the servicer of record, at all relevant times, of the loans at issue (specifically the 304 individual loan files identified on Exhibit "A" to the Baldini Certification (the "Loans in Issue")) and was contractually and legally required to have executed, recorded and maintained the Loan Documents (all original notes, mortgages, deeds of trust, other security instruments and modifications of the foregoing).

To date, AFR has undertaken a patient "allow Nationstar to correct the defects[2]" approach given Nationstar's unique position as the only one capable of doing so based upon certain applicable HUD regulations and policies (as discussed in greater detail below).  However, recently learning of: (a) a borrower being foreclosed on by Nationstar as a servicer for a different lender when, in fact, the borrower was faithfully making his payments (remarkably for some

---

[2]Attached as Exhibit "B" to the Baldini Certification two emails, ***exchanged in the context of Settlement,*** redacted except such information essential to the emergent purpose here.  The first confirms a May 7, 2015 Nationstar proposal to have 75% of all Nationstar Document Deficiencies corrected within 30 days, and 95% corrected within 45 days; and the second July 15, 2015 email shows that only approximately 30% of those errors have been corrected – no significant change in over 60 days.

period of time to Nationstar as AFR's servicer, more fully discussed below, (the "LaCasse Matter"))[3]; and (b) HUD notifying AFR that AFR is required to refund approximately $3,000,000 to HUD as a result of Nationstar's failure to supply and/or record Notes and mortgages for (87) loans (the "HUD Partial Claim defect") – a mere subset of the overall Nationstar Document Deficiencies.[4]  As feared, and as evidenced by the representative "LaCasse Matter" and the HUD Demand, "times up."

If the HUD Partial Claim defect alone is not corrected, HUD will reclaim proceeds of claim monies paid resulting in an immediate damage to AFR of $2,894,232.77.[5]  In fact, given the looming deadline, this damage is likely to be now unavoidable, but is only the tip of the iceberg.  If the missing collateral files and unrecorded modification loan documents that also comprise the Nationstar Document Deficiencies are not corrected, this will result in imminent damage to AFR having to purchase those loans out of loan pools in excess of $48,000,000.[6]  This imminent and irreparable damage will occur if these wholly correctable issues are not corrected by the only party capable of correcting them - Nationstar.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

### A. The Underlying Litigation

Plaintiff AFR is a New Jersey company in the business of originating, brokering and servicing mortgage loans throughout the United States.  Nationstar is in the business of, *inter alia,* servicing and "sub-servicing" mortgage loans on behalf of others throughout the United

---

[3]See Demand from Mr. LaCasse's counsel attached as Exhibit "C" to the Baldini Certification.
[4]See Demand from HUD attached as Exhibit "D" to the Baldini Certification (the "HUD Demand").
[5]See Spreadsheet of loan damages by category attached as Exhibit "A" to the Baldini Certification, Sheet 1.
[6] See Spreadsheet of loan damages by category attached as Exhibit "A" to the Baldini Certification, Sheets 2 and 3.

States.  On August 1, 2011, AFR entered into a "Subservicing Agreement" (the "Contract") with Nationstar's predecessor here, Aurora Bank, FSB ("Aurora"). (See attached as Exhibit "E" to the Baldini Certification.)  Pursuant to the terms of the Contract, Aurora agreed to service certain mortgage loans on behalf of AFR, which included but was not limited to, the duty to abide by all Accepted [Mortgage] Servicing Practices, as defined in the Contract.  Thereafter, on or about March 26, 2012, Nationstar and AFR executed a Consent, Amendment and Servicer Appointment (the "Appointment"), through which Nationstar acquired from Aurora all of the servicing rights and obligations under the Contract beginning July 1, 2012.  (See attached as Exhibit "F" to the Baldini Certification.)  Generally, Nationstar represented and warranted that it maintained facilities, procedures, and experienced personnel necessary and sufficient for the servicing of AFR's mortgage loans in accordance with Accepted [Mortgage] Servicing Practices, as well as all applicable legal, regulatory and quasi-regulatory standards.  More specifically, Nationstar agreed:

> Section 2.01.  Contract for Subservicing; Possession of Servicing Files.
>
> . . .
> The contents of each Servicing File delivered to the Subservicer shall be held by the Subservicer in order to subservice the Mortgage Loans pursuant to this Agreement and are and shall be held in trust by the Subservicer for the benefit of the Company and the Owner, as their interests may appear. The Subservicer's possession of each Servicing File is at the will of the Company for the sole purpose of facilitating subservicing of the related Mortgage Loan, and such retention and possession by the Subservicer is in a custodial capacity only. Each Servicing File shall be electronically marked to clearly reflect the ownership of the related Mortgage Loan. The Subservicer shall release from its custody the contents of any Servicing File only in accordance with written instructions from the Company or the Owner, unless such release is required as incidental to the Subservicer's servicing of the Mortgage Loans or is otherwise conducted in accordance with the applicable Underlying Servicing Agreement and the Servicing Standard.
>
> Section 2.03.   Delivery of Documents.
>
> The Subservicer shall forward to the Company or the Owner (or its designee, including the Custodian), in each case as required by the Underlying Servicing Agreement or the Servicing Standard, original documents evidencing an assumption, modification,

consolidation or extension of any Mortgage Loan entered into in accordance with this Agreement within two (2) weeks of their execution, provided, however, that the Subservicer shall provide the Company with a copy of any such document submitted for recordation within two (2) weeks of its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within three hundred sixty (360) days of its submission for recordation.  If such copy has not been returned by the applicable recording office within three hundred sixty (360) days of its submission, the Subservicer shall use commercially reasonable efforts to obtain such copy.

Section 10.01. <u>Termination Procedures; Successor to the Subservicer.</u>

. . . The Subservicer shall deliver promptly to the successor servicer . . . all Servicing Files and related documents and statements held by it hereunder and the Subservicer shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and definitively vest in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Subservicer.

Within the first year of the Appointment, AFR realized that Nationstar was exhibiting a pattern of servicing "shortfalls" associated with AFR's mortgage loans; *i.e*., breaches of the Contract and Appointment, as well as the applicable legal, regulatory and quasi-regulatory standards, including but not limited to, Accepted [Mortgage] Servicing Practices, HUD Regulations and FHA Guidelines.  These shortfalls, which are outlined at length in AFR's Complaint have caused AFR to suffer substantial, both quantifiable and non-quantifiable, harm. Importantly here however, in light of recent events, if these shortfalls go unattended any longer, they will cause AFR (and innocent third parties including borrowers) to suffer immediate and irreparable harm.  Conversely, if fixed (simply a matter of producing documents Nationstar should already have or should be able to easily get re-executed), not only would the irreparable harm be avoided, this entire controversy would likely be easily resolved.

On January 29, 2014, Nationstar informed AFR that it was terminating the Contract and Appointment effective August 1, 2014.  AFR continued working with Nationstar through the end of the Contract to try to resolve Nationstar's servicing errors and to have its loans transferred

error-free to AFR's new servicer, LoanCare, LLC ("LoanCare").  The transfer of files from Nationstar to LoanCare occurred during August, 2014.  Shortly after the transfer, it became evident to AFR (through LoanCare) that well in excess of 300 of the mortgage loans transferred to LoanCare from Nationstar were missing or had materially defective Loan Documents.  In other instances, the entire collateral file, which contains all the legal documents for a loan (including but not limited to the original promissory note, security instrument, the securitization agreement and proof of title insurance) is missing and cannot be located.  It goes without saying that the Loan Documents and ancillary documents making up a loan file form the fundamental legal basis and rights of a mortgage loan owner and the Nationstar Document Deficiencies bring those fundamental rights and obligations into question.

**B.  AFR's Good Faith Attempts to Work with Nationstar**

Since August 2014, AFR has been attempting to work with Nationstar to correct the Nationstar Document Deficiencies, so that AFR and/or LoanCare, as AFR's current loan servicer, would be able to perform their fundamental duties as a lender and otherwise comply with applicable HUD regulations and FHA Guidelines.  Despite good faith efforts by AFR (and we submit Nationstar gauged by the realities of a sprawling corporation with overtaxed employees), the vast majority of the Nationstar Document Deficiencies remain unresolved **a year later**.[7]

More specifically, on May 7, 2015, AFR, through counsel, sent Nationstar an email in which it confirmed a Nationstar proposed timeframe to rectify the Nationstar Document Deficiencies.  (See attached as Exhibit "B" to the Baldini Certification).  This email stated in

---

[7]Notably, where Nationstar is the servicer of record in the official HUD record, Nationstar is the only party who HUD will permit to correct the Nationstar Document Deficiencies or otherwise access the records.

relevant part that "75% of all issues would be resolved within 30 days [June 7], and 95% of all issues would be resolved in 45 days [June 22]." *Id.* Nationstar agreed to these metrics and timeframes. Despite active and spirited participation and encouragement from AFR to assist Nationstar in any way possible in meeting the agreed metrics and timeframes, Nationstar failed to correct the Nationstar Document Deficiencies as agreed. In fact, they haven't even come close and 70% of the issues remain unresolved. *Id*.

Nationstar's failure to provide or otherwise produce the documents necessary to rectify the Nationstar Document Deficiencies will cause AFR and innocent third parties to suffer immediate and irreparable harm in several regards.

### C. <u>Nationstar's Document Deficiencies Irreparably Injure Borrowers</u>

First and foremost, Nationstar's Document Deficiencies injure innocent borrowers. This is best demonstrated by explaining a recently discovered loan servicing "debacle," the LaCasse Matter. LaCasse is a poignant example of what havoc can be wrought by the Nationstar Document Deficiencies. Mr. LaCasse had a loan (the "Prior LaCasse Loan") which he desired to "refinance" with AFR. That "refinance" closed on October 26, 2011 (the "AFR LaCasse Loan") at which time the proceeds of the AFR LaCasse Loan were to be used to payoff the Prior LaCasse Loan and to put the AFR mortgage in "first position" – a typical refinance scenario. For whatever reason, the Prior LaCasse Loan was not "paid off," the AFR LaCasse Loan did not become a first position lien, no one informed AFR of the foregoing, the AFR Loan (which should be the only loan) was being paid and is current, the Prior LaCasse Loan was not being paid (as Mr. LaCasse reasonably thought it was paid off and in any event shouldn't have to pay what was accounted for at the closing of the AFR LaCasse Loan) and the Prior LaCasse Loan was put into foreclosure. Notably, Nationstar serviced the AFR LaCasse Loan from around June

2012 through August 2014, ***and also serviced the Prior LaCasse Loan during this timeframe and is still doing so today (a loan in which it is sending default notices and Intent to Foreclose notices to 12 Cutler Street while simultaneously collecting all current payments and paying escrows on behalf of 12 Cutler Street).*** Nationstar not only failed to alert AFR (or the prior lender) of this circumstance, it actually instructed an attorney to foreclose. Nationstar's right hand did not know what its left hand was doing – all to the detriment of Mr. LaCasse, the Prior LaCasse Loan Lender and AFR. Now, ***some 4 years later***, Mr. LaCasse inexplicably has a foreclosure Judgment against his property, the Prior LaCasse Loan remains in first position, and the AFR LaCasse Loan, which was supposed to be a first position loan, is in fact, foreclosed. To make matters worse, AFR only became aware of the foregoing when Mr. LaCasse sent a Demand Letter to AFR alleging "fraudulent servicing." (See attached as Exhibit "C" to the Baldini Certification).

By way of further example, for many foreclosures, there is a deficiency for which the borrower will remain liable after the proceeds of the foreclosure sale have been realized (i.e. the difference between what was realized at the foreclosure sale and the amount outstanding under the loan). AFR's inability to properly maintain properties during foreclosure proceedings, or post foreclosure, increase such deficiency and the completely avoidable consequent damages to the borrower who has already lost a home. That will occur here if the relief requested is not granted.

By way of further example, for "modified" loans, HUD at times insures reductions in what's owed as part of federal incentive programs for borrowers to remain in their home. These are called "partial claims." However, in order to be eligible for those 'partial claims,' true and correct copies of the newly executed modified Note and duly recorded Mortgage must be sent to

HUD.  As with LaCasse, if the newly executed Note and Mortgage are not properly recorded (the exact situation for many of the Nationstar Document Deficiencies), the original Note and Mortgage remain of record, not the "modification."  In that situation, the lender of record is not entitled to the incentive 'partial claims' payments – de-incentivizing lenders to continue to offer those programs.

The implications of the failure to record and maintain these key Loan Documents is patent and frightening.

**D.  AFR's Inability to Access the HUD Web Portal Irreparably Injures AFR**

As noted above, Nationstar, as the party designated as the "owner" on the official HUD record, is the only party able to access the loan files and as such, the only party able to take **any action** whatsoever regarding subject mortgage loans, *i.e.,* it is only Nationstar who <u>can</u> take corrective action.  AFR and LoanCare are effectively "locked out" of taking any action until the Nationstar Document Deficiencies are cured.

As such, the Nationstar Document Deficiencies prohibit AFR from taking any actions relating to the actual properties associated with the loans.  This puts both the homeowners and the public at large in imminent danger.  For example, certain of the properties associated with the subject loans are unoccupied for various reasons and currently sit vacant.  AFR, due to the Nationstar Document Deficiencies, is not listed as the owner (in the case of a foreclosure) or the holder of any security instrument (in the case of pre-foreclosure) associated with these unoccupied properties.  As a result, AFR cannot take any actions relative to these properties.  In short, these properties are what have come to be known as "zombie foreclosures,"[8] properties

---

[8] A "Zombie foreclosure" is an instance where a borrower vacates a property due to receiving a foreclosure notice from a loan servicer, but title is never transferred out of the vacated homeowner's name to the mortgage bank or other third-party.  This creates a vacant property

where no party has clear legal control over the property.  For example, with zombie foreclosures, AFR cannot take such basic actions as: (1) placing insurance coverage on the property; (2) inspecting the property to check for dangerous conditions or other problems; (3) fixing and repairing dangerous conditions; and (4) otherwise maintaining the property in the normal course, for example winterizing foreclosed and unoccupied properties.

Aside from creating an obvious dangerous condition to the public, zombie foreclosures also place borrowers at risk for legal liability.  Even though these borrowers have vacated the properties (both pre and post foreclosure), the vacated homeowners still legally own the property **and are therefore liable for any injuries or other harms that arise from the now unattended (and uninsured) property** (although they probably don't realize it).

As noted, AFR is not permitted to inspect and maintain the properties.  When the homeowner defaults on the mortgage, AFR looks to the secured property for repayment.  Here, due to the fact that AFR cannot inspect and maintain the subject properties, due to the Nationstar Document Deficiencies, the properties are falling into disrepair and are suffering unnecessary damage.  This damage reduces the value of properties which in turn reduces the value of the security interest.  This is typically irreversible.  Moreover, and perhaps more importantly, damage to the properties can result in a total loss of the property (*i.e.*, fire, flood, infestation, etc.) due to the fact AFR cannot place insurance coverage on these properties.  In fact, at least 1 property, the Hagan property, has already been completely destroyed without forced place

---

over which neither the mortgage bank nor borrower has clear control of the property.  The property becomes an eyesore and nuisance.

insurance[9].  (See Spreadsheet of loan damages by category attached as Exhibit "A" to the Baldini Certification, Sheet 4).

### E.   Nationstar's Document Deficiencies Irreparably Injure AFR by Threatening its Existence

Lastly, in addition to all the third party perils noted, AFR, as a mortgage loan origination company, and employer of well over 400 people, is in the business of selling (conveying) those mortgage loans, or rights inherent in them, to the secondary market.  The sale of originated mortgage loans on the secondary market in turn frees up lines of credit, which AFR in turn uses to originate new mortgage loans.  In short, the ability to sell originated mortgage loans on the secondary market is what "makes the wheels go round."  Nationstar's failure to supply HUD, AFR or LoanCare with the Loan Documents will cause the mortgage loan in issue **to become "non conveyable,"** *i.e.,* of a character where mortgage loan investors do not want them in their portfolios, whether because of simple title errors, because there is no accurate recorded title or because it is uninsured.  As such, a 'non-conveyable' mortgage has significantly less value. Before the transfer of the servicing to Nationstar, the subject 304 mortgage loans at issue were all fully HUD insured, *i.e.,* fully conveyable.  Now, due the Nationstar Document Deficiencies, neither AFR, nor LoanCare at AFR's behest, can sell or otherwise convey the subject mortgages in the secondary market in the normal course of business.  These mortgages are essentially in "limbo" and no longer serve their intended purpose.  In fact, even where a loan is current, if it is uninsurable (and thus, 'non-conveyable'), AFR's principal is tied up and cannot be used to fund new loans causing a negative effect.  Simply stated, until the Nationstar Document Deficiencies

---

[9]While Nationstar has indicated that it has a "blanket policy" intended to cover this exact circumstance, more than a year later that remains to be seen.

are cured, AFR cannot sell, bundle, pool or otherwise convey any of the subject 304 mortgage loans other than in a "distress sale" for pennies on the dollar.

Moreover, in instances where the subject loans have already been securitized, pooled or otherwise sold in the secondary market, the bulk of the loans in issue here, **AFR is obligated to repurchase those loans if they are not FHA insured**. The cost to AFR to repurchase the loans at issue here back will be approximately $48,000,000. (See Spreadsheet of loan damages by category attached as Exhibit "A" to the Baldini Certification, Sheets 3 & 4). However, that is not the end of the story, having that much capital tied up in loans that are non-conveyable effectively prevents AFR from accessing any of its lines of credit and AFR may be unable to write new loans. Thus, AFR is facing an imminent loss of over $48,000,000 due exclusively to the Nationstar Document Deficiencies which jeopardizes the enterprise.

### F.  **Mandatory HUD Claim and Incentive Remittal**

In addition to the foregoing imminent and irreparable injuries, in regards to at least 97 of the 304 mortgage loans at issue, the Nationstar Document Deficiencies also subject AFR to imminent large scale reclaimed payments from HUD, specifically pursuant to 24 CFR 203.371 and other HUD Regulations. 24 CFR 203.371(d) states that if a mortgagee [here, AFR] does not provide to HUD an original credit instrument within sixty (60) days of execution and the original security instrument within six (6) months of execution [here, the recorded security instrument and/or mortgage], the mortgagee will be required **to reimburse to HUD the full claim amount[10], including the incentive fee.**  While the HUD Letter of May 22, 2015 demands a remittance of $3,093,690.59, and while Nationstar has corrected the errors in connection with a

---

[10] The full claim amount is the amount of the insurance benefits consisting of the arrearage, principal deferment if necessary, and any HUD-allowed costs related to the default. See HUD Mortgagee Letters 2012-22 and 2013-19.

scant few of those, AFR and LoanCare have identified additional loans that suffer the same Nationstar Document Deficiencies totaling $3,588,809.61, of which, $2,894,232.77 is scheduled to be reclaimed on August 18, 2015.  (See Spreadsheet of loan damages by category attached as Exhibit "A" to the Baldini Certification, Sheet 1).

## LEGAL STANDARD

To prevail on an application for a preliminary injunction, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm in the absence of preliminary relief; (3) that the balancing of the equities tips in the moving party's favor; and (4) that an injunction is in the public interest.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20, 24 (2008); *accord American Express Travel Related Servs., Inc. v. Sidamon–Eristoff,* 669 F.3d 359, 366 (3d Cir.2012); *Kos Pharm., Inc. v. Andrx Corp.* 369 F.3d 700, 708 (3d Cir.2004).  While a preliminary injunction is an extraordinary remedy, a district court's decision to issue a preliminary injunction is purely discretionary.  *Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1334 (Fed.Cir.2006).  Moreover, when a moving part is seeking injunctive relief, such as here, the burden on the moving party is particularly heavy and such injunctive relief should issue only upon "a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995) (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985); *Punett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980).

While the foregoing is a heavy burden, here, where the only relief demanded is for Nationstar to produce documents which they have, or should have in their possession, or which can be, with some minimal effort, replaced (and something for which they have already been

paid to do), the burden is easily satisfied given the truly troubling consequence of failing to grant the instant application.  AFR can clearly demonstrate: (1) that it is likely to prevail on the merits; (2) AFR and its borrowers will be irreparably injured in the absence of the relief requested; (3) the equities tip decidedly in AFR and the borrowers' favor; (4) granting the instant application is in the public interest; and (5) that extreme and/or very serious damages have, and will continue to result in the absence of the requested relief.

A.  **<u>AFR has a high likelihood of success on the merits</u>**

AFR will clearly prevail.  Under the terms of the Contract and associated Appointment, Nationstar represented and warranted that it maintained facilities, procedures, and experienced personnel sufficient and necessary for the servicing of AFR's mortgage loans in accordance with Accepted [Mortgage] Servicing Practices, as well as all applicable legal, regulatory and quasi-regulatory standards.  (See Exhibit "E" to the Baldini Certification, and Sections 2.10, 2.03 and 10.01 reproduced in relevant part above, noting Nationstar's contractual requirements to possess and deliver the servicing files and to "do such other things as may reasonably be required to more fully and definitively vest in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Subservicer).  Moreover, included in "all applicable legal, regulatory and quasi-regulatory standards" are of course all HUD Regulations, including but not limited to 24 CFR 203.371 and all FHA Guidelines.

24 CFR 203.371(d) states that:

> Along with the prescribed application for partial claim insurance benefits, the mortgagee shall provide HUD with the original credit instrument no later than 60 days after execution. The mortgagee shall provide HUD with the original security instrument, required by paragraph (c) of this section, no later than 6 months following the date of execution. If the mortgagee experiences a delay from the recording authority, it may request an extension of time, in writing, from HUD. If the mortgagee does not provide the original of the note and security instrument within the prescribed deadlines, the mortgagee shall be required to reimburse the amount of the claim paid, including the incentive.

15

Therefore, Nationstar has a clear and unambiguous contractual and regulatory obligation to provide to AFR, LoanCare and HUD all necessary documents to comply with HUD and FHA regulations for the 304 subject mortgage loans.  Nationstar, to date, has failed to rectify the Nationstar Document Deficiencies.

**B.   AFR Will Suffer Immediate and Irreparable Harm**

Harm is generally considered irreparable if it cannot be redressed adequately by money damages.  *Crowe v. De Gioio*, 90 N.J. 126, 132-34 (1982).  However, in situations such as here, where the harm suffered by the plaintiff would be especially disproportionate in comparison to the harm suffered by the defendant from the granting of the injunction, an injunction may issue even if the loss may be compensated by money damages. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)(citing *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir.1984)); *see also Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 206 (3d Cir.1990).  Additionally, if there is a "loss of business and goodwill, and threatened loss of the enterprise itself" then there is irreparable injury sufficient to justify the issuance of a preliminary injunction. *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233, 236 (D.N.J. 1976).

Here, and as noted above, the variety of irreparable injury is vast and varied and includes in addition to, and/or amplification of, the examples explained above:

**1.   IRREPARABLE DAMAGE WILL RESULT WHEN LOANS ARE NO LONGER FHA OR HUD INSURABLE.**

Loans eligible for FHA and HUD insurance are required to meet certain statutory requirements.  For modification loans, a true and correct copy of the modified Note and recorded Mortgage must be recorded sent to HUD within sixty days of closing.  See 24 CFR 203.371; and

12 U.S.C. § 1701 *et seq.*  Failure to comply means the loans lose their eligibility for this insured status and once lost, cannot be fixed except by starting over and going through the re-finance process once again.  The Nationstar Document Deficiencies include missing original Notes and recorded Mortgages for modification loans.  Without the ability to send these documents to HUD, these loans will lose their HUD insurability.  This is damage that money alone cannot fix.

### 2.   IMPROPERLY RECORDED NOTES AND MORTGAGES (OR NOT RECORDED AT ALL) PRESENT AN INACCURATE AND FALSE PUBLIC RECORD.

The Nationstar Document Deficiencies lead to the inability to record the modified Mortgage – you cannot record what is missing – and resultantly creates an inaccurate public record.  The prior Mortgage continues to appear as the operative documents and the new modified Mortgage will not have a first lien position.  The LaCasse Matter described in detail above is a poignant example of the havoc that can be wrought on innocent third parties when shoddy servicing and failure to maintain and record Loan Documents occurs.  Anytime there is a cloud on title because of the failure to record Loan Documents, irreparable harm to innocent third parties occurs – damage that cannot be fixed but by recording the Loan Documents (and insuring the prior Note and Mortgage are cancelled).

### 3.   IRREPARABLE DAMAGE WILL RESULT FROM THE DAMAGES CAUSED TO AFR'S SECURITY INTEREST.

AFR as the mortgagee, holds a security interest in each of the properties associated with the subject 304 mortgage loans.  As is the case with all mortgages, if the mortgagor defaults,

AFR's only recourse is against the mortgagor and the security interest.[11]   Here, due to the Nationstar Document Deficiencies, AFR is suffering large-scale impairment of its security interests.  Such impairment of a security interest is irreparable harm.

Impairment of a security interest or a shift in bargained-for risk constitutes irreparable harm.  *See Citibank, N.A. v. Singer Co .,* 684 F.Supp. 382, 385–86 (S.D.N.Y.1988) (irreparable harm found where a credit agreement required provision of security on lender's request, and the borrower refused to provide that security); *E. N.Y. Sav. Bank v. 520 W. 50th St., Inc.,* 611 N.Y.S.2d 459, 462 (N.Y.Sup.Ct.1994) (irreparable harm found where rent decrease would impair the value of a mortgagee's security interest).

## 4.  IRREPARABLE DAMAGE WILL RESULT FROM NO PARTY HAVING THE LEGAL AUTHORITY TO MAINTAIN AND PRESERVE THE PROPERTIES IN ISSUE.

Here, and as noted above, some portion of the Nationstar Document Deficiencies will result in AFR not be able to inspect, repair, insure, or otherwise maintain those properties. AFR's inability to take any actions as to the subject properties, including those actions to repair, or otherwise maintain the properties has caused and will continue to cause those properties to fall into disrepair or to otherwise suffer damage.  This in turn materially reduces the value of the property, which in turn materially impairs AFR's security interest.  Moreover, in instances where AFR is not able to place insurance coverage on a property, a total loss of the security interest is possible.  At least one such property, the Hagan property, has already been completely destroyed without insurance.  This risk of the total loss of AFR's security interest is increased by the

---

[11] This is especially true here where the subject loans have lost or will lose FHA Mortgage Insurance.

prohibition placed on AFR from making repairs, inspection or otherwise maintaining the properties.

**5.   NATIONSTAR'S FAILURE TO CORRECT THE DOCUMENT DEFICIENCIES WILL CRIPPLE IF NOT KILL AFR.**

Here, Nationstar's failure to rectify the Nationstar Document Deficiencies will immediately result in a HUD reclamation of $2,894,232.77 and soon result in additional monetary repayments of loan principals in excess of $48,000,000.00.  Such an expense will threaten the loss of the enterprise itself and simply having to make this application damages AFR's goodwill.  Pursuant to *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, this is irreparable harm.

In addition to the HUD reclamation noted above, for 94 of the loan files in issue here, none of the collateral loan file documentation can be located.  If this is not rectified, AFR will have to repurchase these loans out of loan pools in the aggregate amount of $14,733,339.77. (See Spreadsheet of loan damages by category attached as Exhibit "A" to the Baldini Certification, Sheet 2).

The foregoing is concrete evidence  that AFR will suffer imminent and irreparable harm if Nationstar does not produce the Nationstar Document Deficiencies.

**C.   Balancing of the relative hardships**

Nationstar will suffer no injury or particular hardship, irreparable or otherwise, if it is compelled to turn over or replace the requested documents – documents it has both a contractual and regulatory obligation to produce; and, documents which it has already agreed to produce but has simply failed to produce.  Pursuant to the Contract and Addendum, as well as HUD Regulations and FHA Guidelines, the documents which are sought via the instant application

should have been obtained and produced (to either AFR or HUD) almost **two years ago**.  AFR is asking for nothing more than what is absolutely necessary in order for it (and Nationstar) to: (a) comply with HUD Regulations and FHA Guidelines and (b) not suffer catastrophic losses relating to the 304 mortgage loans previously serviced by Nationstar.  There is simply no hardship on Nationstar in producing the demanded documents.

Therefore, the balance of hardship unquestionably weights heavily in favor of AFR.

**D.   Granting an injunction is in the public interest**

It is in the public interest to require Nationstar to comply with its contractual and regulatory obligations. Here, the purpose of FHA Mortgage Insurance is to encourage lenders to make mortgage credit available for borrowers who would not otherwise qualify for conventional mortgage loans and to residents of disadvantaged neighborhoods.  See 12 U.S.C. § 1701 *et seq*. AFR, as an FHA approved lender, underwrote and funded the 304 mortgage loans at issue in reliance upon the protections provided by the FHA Mortgage Insurance Program.  Without compelling Nationstar to produce the Nationstar Document Deficiencies, AFR will lose FHA Mortgage Insurance coverage on the mortgage loans in issue and will be forced to remit $2,894,232.77 back to HUD immediately and millions more in the repurchase of loans in the very short term.  There is a strong public interest in favor of compelling Nationstar to comply the HUD Regulations and FHA Guidelines and its contractual obligations.  These Regulations and Guidelines are what allow the FHA Mortgage Insurance Program to function.  Thus, there is a strong public interest in their enforcement.

Moreover, the free alienability of private property and accurate public records are important public interests.  Thus, there is a very strong public interest in clearing up the clouds

on title associated with the properties securing the 304 mortgages at issue. We're sure Mr. LaCasse would agree.

As noted above, many of these properties, both pre and post foreclosure, are unoccupied. Though the properties are unoccupied, due to Nationstar Document Deficiencies, in many instances the vacated homeowners are listed as holding title to the unoccupied property. It can not be fairly disputed that these so called "zombie foreclosures" are detrimental to the public interest. First, even though the homeowners have vacated the properties, the vacated homeowners still legally hold title to the property and are therefore liable for any injuries or other harms that arise from the property. This problem is made worse by the fact that the properties can be completely uninsured due to the fact that there is no homeowner and AFR cannot take any actions relating to the properties. Moreover, these properties cannot be conveyed and will sit vacant, thereby diminishing overall property values and increasing deficiency judgments, until such time as title can be perfected.

Therefore, it is clearly in the public's interest to grant the requested relief.

## <u>CONCLUSION</u>

For the foregoing reasons and in consideration of all the attached evidence, it is respectfully requested that the proposed Order be entered.

Respectfully Submitted,

**THE MCHATTIE LAW FIRM, LLC**
*Attorneys for Plaintiff*
*American Financial Resources, Inc.*

By:     _/s/ Christopher J. McHattie, Esq._

Dated:  August 12, 2015

21